CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
AUG 04 2005
JOHN F. CORCORAN, CLERK
BY:
              DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

DAVID E. CONLEY, )
  ) Civil Action No. 5:04CV00030
   Plaintiff, )
  ) **OPINION**
v. ) By: Hon. Glen E. Conrad
  ) United States District Judge
TOWN OF ELKTON, et al., )
  )
   Defendants. )

David E. Conley, a former police officer for the Town of Elkton, filed this action pursuant to 42 U.S.C. § 1983 against the Town of Elkton; the Chief of Police for the Town of Elkton, Richard Pullen; and six members of the Elkton Town Council: Cathy Murphy, Jay Dean, Phillip Workman, Theodore Pence, Lucky Sigafoose,[1] and Randall Snow. Conley alleges that he was terminated from the police department in violation of his First Amendment rights. Conley also asserts a state law claim for defamation against Chief Pullen. The court has jurisdiction over Conley's claims pursuant to 28 U.S.C. §§ 1331 and 1367. The case is currently before the court on the defendants' motion for summary judgment. For the following reasons, the court will grant the defendants' motion.

### BACKGROUND

Conley began working as a police officer for the Town of Elkton in September 2000. (Conley Dep. at 21). Shortly thereafter, the police chief was terminated and Conley applied for the position. (Conley Dep. at 27-28). Although Conley was told that he would receive the position, Richard Pullen was ultimately chosen. (Conley Dep. at 28, 30).

---

[1] On March 3, 2005, Lucky Sigafoose's death was suggested upon the record by the defendants. The plaintiff subsequently moved to substitute Joan Sigafoose for the defendant. Upon being advised that there were no objections to the requested substitution, the court entered an order granting the plaintiff's motion on July 20, 2005.

Conley knew Chief Pullen from when they worked together for the Page County Sheriff's Department. (Conley Dep. at 132). Conley worked in Page County from 1989 to 2000. (Conley Dep. at 14, 17). Chief Pullen worked in Page County from 1985 to 2000. (Pullen Dep. at 7). At some point during the early 1990s, Conley's wife advised Chief Pullen's wife that Chief Pullen was having an affair. (Conley Dep. at 132). Conley testified at his deposition that he "guess[ed] that would cause [Chief Pullen] to have some animosity toward [him]." (Conley Dep. at 132). Nonetheless, Conley was excited about working with Chief Pullen again. (Conley Dep. at 30).

During the course of his employment with the Town of Elkton, Conley was productive and adept at solving cases, and he had more arrests and cleared cases than any other officer. (Pullen Dep. at 62, 158, Conley Decl. at 3). However, as Conley acknowledged during his deposition, other officers had trouble getting along with him. (Conley Dep. at 38, 41, 97). Two of those officers were John Painter and Harold Shiflett. Painter and Shiflett resigned from the police department in 2001, partly because of Conley. (Defendants' Exhibit 1, Shiflett Dep. 7-8). Before they resigned, Painter and Shiflett attempted to set Conley up in a compromising position with a female acquaintance, Tara Shiflett, in an effort to have Conley fired. (T. Shiflett Decl. at 1-2). Although Tara Shiflett reported the incident to Chief Pullen, no action was taken against either officer. (Conley Decl. at 3).

Conley began attending meetings held by a local neighborhood watch group in 2001. (Conley Dep. at 67). He provided programs for the group's meetings and assisted with fundraising. (Conley Decl. at 4). During the summer of 2002, the group engaged in a discussion about drug prevention. (Conley Dep. at 70, 72). Conley suggested that a canine unit would be the best drug deterrent in a small town. (Conley Dep. at 70). Based on this suggestion, members of the neighborhood watch group decided to raise money for a canine unit. (Conley Dep. at 70).

2

The members approached Chief Pullen with the idea, and he agreed to discuss the matter with the Town Council. (Conley Dep. at 75, 76). However, some of the Town Council members were not notified until after the group had begun raising money for the canine unit. (Conley Dep. at 79). Councilwoman Murphy testified that the canine issue created "havoc" because the issue was made public before the Town Council had an opportunity to address it. (Murphy Dep. at 32). Murphy explained that although the Town Council members were supportive of having a canine unit, they were "left scrambling to figure out how [they] were going to accommodate a canine, who the canine officer was going to be, training, expenses, all the things that are related to a canine operation." (Murphy Dep. at 33). Additionally, Chief Pullen felt pressure from the neighborhood watch group to appoint Conley as the canine officer, even though he felt another officer, James Morris, was more capable of handling the dog. (Pullen Dep. at 69). The Town ultimately selected Conley to serve as the canine officer in January or February 2003, but he was terminated before he began training for the position. (Conley Dep. at 135, Pullen Dep. at 135).

Around the time that Conley was selected to work as the canine officer, an incident occurred involving Officer Morris. (Conley Dep. at 136). In an effort to get in touch with Conley, Morris repeatedly called Conley on his police radio. (Conley Dep. at 63, Morris Dep. at 26). Morris wanted Conley to know that he was no longer interested in working as the canine officer, and he wanted Conley to stop by his house to discuss the position. (Morris Dep. at 26-27). Conley thought that Morris sounded intoxicated, so he reported the incident to Chief Pullen. (Conley Dep. at 62-63). Although Chief Pullen listened to the tapes of Morris's calls, he was unable to determine whether Morris was intoxicated. (Conley Dep. at 161, 162).

During the last month of Conley's employment, he had breakfast at a local restaurant with John Boone, a Massanutten police officer. (Conley Dep. at 106). Conley was in uniform

3

and on duty at that time. (Conley Dep. at 107, 108). Conley mentioned to Boone that a lot of people disliked Chief Pullen, and that a group was attempting to have him fired. (Boone Dep. at 18, 40). Conley also asked Boone how much money it would take for him to go to work for the Town of Elkton. (Boone Dep. at 23). Boone testified that Conley's question could lead to the assumption that Conley was offering him a job "just in case Pullen got fired." (Boone Dep. at 23).

While Conley was talking to Boone, another customer walked by the officers. (Boone Dep. at 10). Conley asked the customer who he was planning to vote for in the upcoming election for sheriff in Rockingham County. (Boone Dep. at 10). After the customer stated that he was voting for Donald Farley, Conley said "when I get some time and I'm off duty let me talk to you." (Boone Dep. at 10-11). Although Conley did not specifically express a preference for Farley's opponent, Boone testified at his deposition that "you can assume he did since there's only two major candidates." (Boone Dep. at 12). Conley's comments to the customer made Boone feel uncomfortable because his police department had a policy that barred officers from becoming involved in the election for sheriff. (Boone Dep. at 17). For this reason, Boone reported the conversation to his supervisor to avoid being accused of having discussed the election. (Boone Dep. at 19-20). Chief Pullen ultimately learned about the conversation and spoke to Boone about it. (Boone Dep. at 30, Conley Dep. at 76). Boone relayed Conley's comments to Chief Pullen. (Boone Dep. at 42).

Chief Pullen decided to recommend Conley's termination. (Pullen Dep. at 125). On April 8, 2003, the Town Council went into closed session to discuss Conley's employment. Chief Pullen presented a written list of eight reasons that he believed justified Conley's termination. (Pullen Dep. at 92, Def. Exhibit 5). The list stated as follows:

4

1. Enter into conspiracy to disrupt the operation of Police Department.
2. Interfering with cases of other officers.
    395 in court.
    391 at Neighborhood Watch.
3. Participate in political campaigns while on duty.
4. Failed to take felony warrants to Sheriff's Office on the day told to do so. (02/20/2003).
5. Becomes defensive when questioned about activities.
6. On two separate occasions has failed to appear for court cases without proper notification.
7. Informed in writing that Conley is reluctant to deal with friends and relations.
8. On three separate occasions Conley has been called before council for altercations with superiors and co-workers.

(Def. Exhibit 5). In addition to these stated reasons, Chief Pullen advised the Town Council that Conley failed to attend a firearms training session. (Printz Dep. 62, Dean Dep. 43). After hearing from Chief Pullen, the members of the Town Council unanimously voted to terminate Conley's employment. (Printz Dep. at 62). Section 27-4 of the Elkton Town Code authorizes the Town Council to terminate a police officer's employment upon the recommendation of the police chief. (Def. Exhibit 7).

Conley filed suit against the defendants on April 8, 2004. Conley alleged that he was terminated from the police department in violation of his rights to free speech, free association, and procedural due process. Conley also asserted a claim for defamation against Chief Pullen, Councilwoman Murphy, Councilman Sigafoose, and the Town. The defendants subsequently moved to dismiss the plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On February 22, 2005, the court entered an order dismissing the plaintiff's procedural due process claim and the plaintiff's defamation claim against Sigafoose, Murphy, and the Town. The court denied the defendants' motion to dismiss with respect to the plaintiff's defamation claim against Chief Pullen, and the plaintiff's First Amendment claim.

5

## STANDARD OF REVIEW

The case is currently before the court on the defendants' motion for summary judgment on the remaining claims. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is properly granted if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Industries, Inc., 763 F.2d 604, 610 (4th Cir. 1985). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## DISCUSSION

### Conley's First Amendment Claim under § 1983

Section 1983 imposes civil liability on any person who, under color of state law, "subjects" another person to the deprivation of any rights or privileges secured by the Constitution and laws of the United States, or "causes [him] to be subjected" to such deprivation.[2] 42 U.S.C. § 1983. In this case, Conley alleges that Chief Pullen, the members of the Elkton Town Council, and the Town violated his First Amendment rights. Specifically,

---

[2] Since only the Town Council has the power to terminate police officers, the defendants argue that Chief Pullen cannot be held liable under § 1983 for merely recommending Conley's termination. However, as the plaintiff correctly points out, the "section 1983 causation language, 'subjects or causes to be subjected,' imposes liability not only for conduct that directly violates a right but for conduct that is the effective cause of another's direct infliction of the constitutional injury." Sales v. Grant, 158 F.3d 768, 776 (4th Cir. 1998).

6

Conley alleges that he was terminated because (1) he complained to Chief Pullen about matters of public concern, (2) he associated with the neighborhood watch group, and (3) he expressed support for a candidate in the election for sheriff in Rockingham County. For the reasons explained below, the court concludes that Conley's first allegation fails as a matter of law, because there is insufficient evidence of a causal connection between Conley's complaints to Chief Pullen and his termination. The court concludes that Conley's second and third allegations fail as a matter of law, because his interest in associating with the neighborhood watch group and supporting a candidate in the election for sheriff did not outweigh the defendants' interest in preserving discipline and neutrality within the police department. Moreover, there is insufficient evidence of a causal connection between Conley's association with the neighborhood watch group and the Town Council's decision to terminate him.

1. Conley's complaints about matters of public concern

Conley first alleges that Chief Pullen recommended Conley's termination because he complained to the chief regarding matters of public concern. Conley further alleges that the members of the Town Council relied on these complaints as part of their termination decision. It is well established that "citizens do not relinquish all of their First Amendment rights by virtue of accepting public employment." Kirby v. City of Elizabeth City, 388 F.3d 440, 445 (4th Cir. 2004) (citing United States v. Nat'l Treasury Employees Union, 513 U.S. 454, 465 (1995); Connick v. Myers, 461 U.S. 138, 142 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). However, "just as an employee has a right to speak -- even at work -- public employers have the right to run efficient, functional operations...." Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 351 (4th Cir. 2000). Therefore, courts must "seek 'a balance between the interests of a public employee, as a citizen, in commenting upon matters of public concern and

7

the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Connick, 461 U.S. at 142 (quoting Pickering, 391 U.S. at 568)).

With these principles in mind, a three-step analysis is used to determine whether a public employer's retaliatory action violates an employee's right to free speech. First, the speech at issue must relate to a matter of public concern. Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004). Second, the "employee's interest in First Amendment expression must outweigh the employer's interest in [the] efficient operation of the workplace." Goldstein, 218 F.3d at 352. Third, there must be a causal connection between the protected speech and the employer's retaliatory action. Love-Lane, 355 F.3d at 776. Specifically, the plaintiff must demonstrate that his protected speech was a "substantial factor" that led to his termination. Goldstein, 218 F.3d at 356. Although the first two steps involve questions of law, the causation element is a question of fact. Id. at 352. Nevertheless, this element may serve as a basis for summary judgment when there are no causal facts in dispute. Id.

Conley identifies several statements that he made to Chief Pullen, which allegedly led to his termination. According to notes taken by a former member of the Town Council in 2001, Conley offered Chief Pullen numerous suggestions for improving the operation of the police department, and he complained to Chief Pullen about the lack of work performed by other police officers. (Pl. Exhibit 1 at 3). Conley also emphasizes that he complained to Chief Pullen about the time that Officer Morris repeatedly called Conley on his police radio. Conley believed that Morris was intoxicated on the day he made the calls, and that he was misusing police equipment.

Even if the court assumes that Conley's complaints to Chief Pullen involved matters of public concern, and that his interest in First Amendment expression outweighed Chief Pullen's

8

interest in the efficient operation of the police department, Conley cannot establish a claim for retaliation on the basis of these complaints. The court concludes as a matter of law that no reasonable jury could find that there was a causal connection between Conley's complaints and his termination.

Conley has submitted no evidence to suggest that his complaints played a substantial role in Chief Pullen's decision to recommend his termination, or in the Town Council members' decision to terminate him. In fact, there is no evidence that Chief Pullen even discussed Conley's complaints when he appeared before the Town Council in April 2003. Chief Pullen provided the Town Council a list of eight specific reasons for Conley's termination, none of which involved Conley's complaints about Officer Morris or the lack of work performed by other officers.[3] Likewise, during their depositions, the Town Council members articulated justifications for Conley's termination that did not involve Conley's statements on these matters.[4]

The plaintiff goes to great lengths to show that he was an outstanding police officer and that the facts underlying the articulated justifications for his termination were inaccurate. However, it is not the province of the court to decide whether the reasons for Conley's termination were wise, fair, or even correct. See Goldstein, 218 F.3d at 356. Instead, there must be evidence indicating that the justifications for Conley's termination were a pretext for

---

[3] One of the only issues that Chief Pullen discussed at the Town Council meeting, which was not noted on that list, was the fact that Conley missed a firearms training session. Mayor Wayne Printz, who was present for Chief Pullen's discussion, testified at his deposition that aside from Conley's absence from the training session, Chief Pullen's discussion at the Town Council meeting was limited to the eight listed reasons. (Printz Dep. at 61-62).

[4] Murphy testified at her deposition that she voted to terminate Conley because he was disrupting the police department, he failed to take felony warrants to the sheriff's department when asked, he failed to appear in court on two occasions, and he had previously been called before the Town Council. (Murphy Dep. at 123). The primary reason that Dean voted to terminate his employment was the fact that Conley failed to take felony warrants to the sheriff's department. (Dean Dep. at 17). Workman testified that he voted in favor of the termination because Conley appeared to be undermining the police chief and the other officers. (Workman Dep. at 35). Pence's decision was based on an incident in which Conley allegedly took drug evidence home with him. (Pence Dep. at 20-21). Snow testified that he voted to terminate Conley because Chief Pullen said that Conley was a disruptive force within the police force. (Snow Dep. at 55-56).

9

retaliation substantially caused by protected speech. Id. Having reviewed all of the evidence, the court concludes that no reasonable jury could find that Conley's complaints about Officer Morris or the lack of work performed by other officers played a substantial role in Conley's termination. See Johnson v. Town of Elizabethtown, 800 F.2d 404, 407 (4th Cir. 1986) (affirming the district court's grant of judgment notwithstanding the verdict in favor of the Town, where there was no proof that the plaintiff's protected speech was discussed during the Town Board's discharge deliberations, and the Board's members testified that the plaintiff's discharge was based on reasons other than her protected speech); Goldstein, 218 F.3d at 356-358 (affirming the district court's award of summary judgment to the defendants, where the record clearly showed that the plaintiff was terminated for reasons unrelated to his allegations regarding public safety).

2. Conley's association with the neighborhood watch group

Conley also argues that Chief Pullen recommended his termination in retaliation for his association with the neighborhood watch group. This argument is based on Chief Pullen's statement to the Town Council that Conley was conspiring to disrupt the operation of the police department. During his deposition, Chief Pullen explained that as a result of Conley's conversation with Boone, he believed that Conley was conspiring with members of the neighborhood watch group to have him fired. (Pullen Dep. at 137, 138).

The United States Court of Appeals for the Fourth Circuit has recognized that "the right to associate in order to express one's views is 'inseparable' from the right to speak freely." Cromer v. Brown, 88 F.3d 1315, 1331 (4th Cir. 1996) (quoting Thomas v. Collins, 323 U.S. 516, 530 (1945)). Nonetheless, a public employee's right to freely associate is not absolute, and the limitations on this right are analogous to the limitations on an employee's right to speak.

10

Edwards v. City of Goldsboro, 178 F.3d 231, 249 (4th Cir. 1999). As previously explained, the "employee's interest in First Amendment expression must outweigh the employer's interest in [the] efficient operation of the workplace." Goldstein, 218 F.3d at 352.

When balancing these interests, courts consider the nature of the employee's job. Jurgensen v. Fairfax County, 745 F.2d 868, 880 (4th Cir. 1984). The Fourth Circuit has recognized that "greater latitude is afforded to police department officials in dealing with dissension in their ranks." Maciariello v. Rowell, 973 F.2d 295, 300 (4th Cir. 1992). Courts have also emphasized that an employee whose job requires extensive public contact, like that of a police officer, enjoys substantially less First Amendment protection when he speaks out in a manner that undermines the operation of his employer, or acts in a hostile way toward his employer. See McVey v. Stacy, 157 F.3d 271, 278 (4th Cir. 1998); Bates v. Hunt, 3 F.3d 374, 378 (11th Cir. 1993).

With these principles in mind, the court concludes that Conley's interest in associating with members of the neighborhood watch group did not outweigh Chief Pullen's interest in maintaining discipline and harmony within the police department. It is undisputed that, based on the substance of Conley's conversation with Boone, Chief Pullen had come to believe that Conley was not a loyal employee and that Conley's interaction with the neighborhood watch group was not limited to the provision of programs at the group's meetings. Obviously, a subordinate police officer would have a disruptive impact on the police department by talking with citizens about having the police chief fired. Rightly or wrongly, this is what Chief Pullen believed that Conley had done during his breakfast meeting with Boone and in his meetings with the neighborhood watch group. (Pullen Dep. at 78, 137-138). As the United States Supreme Court explained in Connick, the "[p]rolonged retention of a disruptive or otherwise

11

unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." 461 U.S. at 151.

Conley also argues that the Town Council members terminated his employment because of his association with the neighborhood watch group. To support this argument, Conley suggests that the Town Council members held Conley's involvement with the neighborhood watch group against him, because they disliked the active role that the group had in promoting the canine program. Conley also argues that the Town Council members held his involvement with the neighborhood watch group against him because the group had actively campaigned against certain Town Council members in 2002. However, only Conley's personal conjecture links his association with the group to his termination. There is no evidence that the group's promotion of the canine program was even discussed during the Town Council's deliberations. Moreover, it is undisputed that all of the Town Council members articulated justifications for Conley's termination that were unrelated to Conley's association with the neighborhood watch group. Therefore, the court concludes that no reasonable jury could find that Conley's association with the group played a substantial role in the Town Council members' decision to terminate him.

3. Conley's political statements

Conley also argues that Chief Pullen and the Town Council members violated his First Amendment rights by relying on his discussion about the election for sheriff in Rockingham County as a basis for his termination. Chief Pullen included on his list of reasons for Conley's termination that Conley "participated in political campaigns while on duty." (Def. Exhibit 5). Apparently, this statement was based on the conversation Conley had with a customer while he was having breakfast with John Boone.

Case 5:04-cv-00030-GEC-BWC Document 62 Filed 08/04/05 Page 12 of 17 Pageid#: 1209

Conley emphasizes that the election for sheriff was clearly a matter of public concern. However, as previously discussed, a public employee's right to discuss matters of public concern is not without limitations. Likewise, a public employee's right to participate in political activities is not absolute.[5] United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 567 (1973). It is undisputed that Conley engaged in the discussion about the election while he was in uniform and on duty. Chief Pullen explained during his deposition that he did not want officers to openly discuss either candidate while they were in uniform and on duty, because he did not want to jeopardize the good working relationships that he had with both candidates. (Pullen Dep. at 19-20). Courts have recognized that law enforcement offices have an interest in "avoiding the appearance of partisanship or partiality." Belch v. Jefferson County, 108 F. Supp. 2d 143, 148 (N.D. N.Y. 2000). Additionally, "[i]n some cases, public endorsement of candidates by police officers has stirred great controversy within police departments and has distracted from the efficiency and the quality of the services provided." Jantzen v. Hawkins, 188 F.3d 1247, 1258 (10th Cir. 1999). The court concludes that Conley's interest in discussing the election for sheriff while he was on duty did not outweigh Chief Pullen's interest in maintaining his department's neutral stance during the election. Accordingly, Conley's political discussion was not constitutionally protected.

In short, the court concludes that Conley did not have a constitutionally protected interest in discussing the election for sheriff in Rockingham County while he was in uniform and on duty, or in associating with the neighborhood watch group for the purpose of discussing Chief Pullen's potential termination. Furthermore, the court concludes that no reasonable jury could

---

[5] Accordingly, both the states and the federal government are permitted to regulate certain political activities by civil servants. Letter Carriers, 413 U.S. at 567. A public employer may also terminate an employee because of his affiliation with a particular party or candidate, if the employer can demonstrate that party affiliation or political allegiance is "an appropriate requirement for the effective performance of the public office involved." Branti v. Finkel, 445 U.S. 507 (1980).

Case 5:04-cv-00030-GEC-BWC Document 62 Filed 08/04/05 Page 13 of 17 Pageid#: 1210

find that Conley's complaints to Chief Pullen or his association with the neighborhood watch group played a substantial role in his termination. Accordingly, the defendants are entitled to summary judgment on the plaintiff's First Amendment claim.[6]

4. Qualified immunity

The court also concludes that even if the termination of Conley did operate to violate his First Amendment rights, Chief Pullen and the members of the Elkton Town Council are entitled to qualified immunity from monetary damages. Qualified immunity protects government officials from liability for civil damages in a § 1983 action "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Given the "difficult-to-apply" balancing test that is involved with First Amendment claims, the Fourth Circuit has recognized that courts can rarely say that the law was so clearly established that reasonable officials would have known that an employee's activity was constitutionally protected. Pike v. Kincer, 301 F.3d 182, 185 (4th Cir. 2002); DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995).

Here, as with most cases, the court cannot conclude that reasonable officials in the defendants' respective positions would have known that terminating Conley because of his complaints to Chief Pullen, his association with the neighborhood watch group, or his political discussion would be a violation of his First Amendment rights. Since the defendants cannot be held liable for what would amount to "bad guesses in gray areas," the court concludes that they are entitled to qualified immunity. Maciariello, 973 F.2d at 298.

---

[6] Having concluded that the individual defendants did not violate Conley's constitutional rights, his municipal liability claim against the Town of Elkton fails as a matter of law. See Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990).

14

## Conley's Defamation Claim

Conley asserts a defamation claim against Chief Pullen. This claim is based on Chief Pullen's statement to the Town Council that Conley "enter[ed] into a conspiracy to disrupt the operation of the police department." The court previously concluded when ruling on the defendants' motion to dismiss that this statement is defamatory per se under Virginia law, since it imputes a lack of integrity in the performance of Conley's duties. See Yeagle v. Collegiate Times, 497 S.E.2d 136, 138 (Va. 1998). However, it is undisputed that Chief Pullen's statement is protected by a qualified privilege, since the statement was made during the course of an employee discharge matter. See Larimore v. Blaylock, 528 S.E.2d 119, 127 (Va. 2000). The only way that Conley can overcome this privilege is by providing clear and convincing evidence that the chief's statement was spoken with common-law malice.[7] Southeastern Tidewater Opportunity Project, Inc. v. Blade, 435 S.E.2d 131, 132 (Va. 1993). Common-law malice is defined as "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication is made." Id.

On summary judgment, the court must determine whether the evidence could support a finding by a reasonable jury that Conley has shown malice by clear and convincing evidence. See Story v. Norfolk-Portsmouth Newspapers, Inc., 118 S.E.2d 668, 671 (1961) ("Generally, of course, malice is a question of fact to be submitted to a jury, but where the communication is

---

[7] The court disagrees with the plaintiff's argument that the qualified privilege applicable to employment matters may be overcome by proof of negligence or recklessness. The Virginia Supreme Court recently clarified the requisite standard in Union of Needletrades, Indust. and Textile Employees, AFL-CIO v. Jones, 603 S.E.2d 920, 924 (Va. 2004). The Court recognized that within the realm of defamation law, an intermediate standard exists between simple negligence and actual malice. Id. However, the court noted that in the context of an employment relationship, a plaintiff must establish that the defendant acted with actual malice in order to overcome the qualified privilege. Id. The court defined "actual malice" as "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." (internal citations omitted). See also Fuste v. Riverside Healthcare Ass'n, 575 S.E. 2d 858, 863(Va. 2003) ("Malice sufficient to overcome a qualified privilege is 'behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made.'") (citing Gazette, Inc. v. Harris, 325 S.E.2d 713, 727 (1985)).

15

privileged, unless there is evidence from which a jury may fairly conclude that there was malice, there can be no recovery."). The Virginia Supreme Court has defined "clear and convincing evidence" as "that degree of proof which produces in the mind of the trier of facts a firm belief or conviction upon the allegations sought to be established. Oberbroeckling v. Lyle, 362 S.E.2d 682, 685 (Va. 1987).

To support a finding of malice, Conley emphasizes that Chief Pullen did not take any action against Officer Shiflett or Officer Painter after they tried to set Conley up in a compromising situation with Tara Shiflett, and that Chief Pullen harboured resentment towards Conley because Mrs. Conley told Chief Pullen's wife about his affair. However, it is undisputed that approximately two years had passed since the incident involving Tara Shiflett, and approximately ten years had passed since Mrs. Conley advised Chief Pullen's wife about the affair. Moreover, it is undisputed that despite these incidents, Chief Pullen later commended Conley's job performance. (Conley Decl. Exhibit 5). Conley's assertion that Chief Pullen was trying to save his own job by having Conley fired first is also insufficient to establish malice. Otherwise, "any time an employee reports misconduct by a co-worker one might say that the employee acted maliciously in trying to curry favor with supervisors at the expense of a co-worker." Echtenkamp, 263 F. Supp. 2d at 1062. While Conley also argues that Chief Pullen did not have any evidence of an actual conspiracy, the Virginia Supreme Court has explained that, in a determination of malice, "the question is not as to the truth or falsity of the communication ...." Larimore, 528 S.E.2d at 121. Rightly or wrongly, Chief Pullen believed that Conley had conspired to have him fired. (Pullen Dep. at 137-138).

It is also important to note that Chief Pullen's statement was taken directly from a provision found in the Code of Conduct for the police department. The Code provides that

16

"[a]ny member of the Police Department who enters into a conspiracy, combination, or agreement with the purpose of substantially interfering with or obstructing the efficient conduct or operation of the police force by a strike or other disturbance, shall be guilty of gross neglect of duty, the penalty for which is dismissal." (Def. Exhibit 8 at 4). Chief Pullen determined that Conley's conduct violated this provision (Pullen Dep. at 143-144), and the chief adopted the Code terminology in stating the grounds for Conley's termination. The fact that Chief Pullen merely adopted the word usage employed in the Code of Conduct further weakens Conley's argument that the statement was concocted with a malicious intent. It was simply one of several reasons offered by the chief in support of his recommendation for Conley's termination. The court concludes that the evidence provided by the plaintiff is insufficient for a reasonable jury to find that Chief Pullen's statement to the Town Council was made with malice. Accordingly, Chief Pullen is entitled to summary judgment on Conley's defamation claim.

## CONCLUSION

For the reasons stated, the court will grant the defendants' motion for summary judgment. The Clerk is directed to send certified copies of this Memorandum Opinion and the accompanying Order to all counsel of record.

ENTER: This 4th day of August, 2005.

_____
United States District Judge